IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Brian Edwards Reid, ) | Civil Action No. 6:11-2408-TMC-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Michael J. Astrue, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for disability insurance benefits ("DIB") on December 7, 2006, alleging that he became unable to work on June 4, 2004. The application was denied initially and on reconsideration by the Social Security Administration. On March 7, 2008, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff appeared on September 11, 2009, considered the case *de novo*, and on October 15, 2009, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The plaintiff requested review by the Appeal Council.

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

On July 16, 2010, the Appeals Council issued an order remanding the case back to the ALJ for further proceedings.  Specifically, the Appeals Council directed the ALJ to consider whether the plaintiff was under a disability within the meaning of the Social Security Act from June 4, 2006, forward; to evaluate the plaintiff's mental impairment; to consider further the plaintiff's obesity and provide an assessment of its effect on his ability to perform routine movement and necessary physical activity within the work environment as stated in SSR 02-1p; to consider the non-examining source opinions; and to give further consideration to the claimant's maximum residual functional capacity ("RFC") (Tr. 82-84). The claimant appeared and testified at a hearing held on January 18, 2011.  On January 27, 2011, the ALJ again found that the plaintiff was not under a disability as defined in the Social Security Act, as amended, from June 4, 2004, through his date last insured, December 31, 2009 (Tr. 17-27).  The plaintiff requested review by the Appeals Council. The Appeals Council granted review, and on August 12, 2011, the Appeals Council issued an unfavorable decision (Tr. 3-6), thereby making the Appeals Council's decision the final decision of the Commissioner of Social Security.  The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the Appeals Council:

> 1.  The claimant met the special earnings requirements of the Act on June 4, 2004, the date the claimant stated he became unable to work.  The claimant continued to meet the special earnings requirements through December 31, 2009.
>
> 2.  The claimant has not engaged in substantial gainful activity since June 4, 2004.
>
> 3.  The claimant has the following severe impairments: degenerative disc disease post-fusion and a history of obesity.

2

4.  The claimant does not have an impairment or combination of impairments that is listed in, or that medically equals, an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  Through the date last insured, the claimant retained the residual functional capacity to perform the full range of sedentary work  as defined in 20 CFR § 404.1567(a).

6.  Through the date last insured, the claimant was unable to perform his past relevant work.

7.  Based on the claimant's residual functional capacity, age, education, and work experience, there were jobs existing in significant numbers in the national economy that the claimant could perform through the date last insured.

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged

3

in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith*

*v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff had a long history of neck pain, culminating in surgical fusion of C5-C7 by George Khoury, M.D., in December 2003 (Tr. 414, 432, 434).  From June 4-8, 2004, the plaintiff was hospitalized with an injury to his back after falling off of a roof (Tr. 349).  A CT scan and x-rays revealed fractures at T12, the sacrum, and coccyx.  At discharge, he was to wear a brace while out of bed and avoid any heavy lifting or strenuous exercise.  Medications prescribed included Percocet, Motrin, Colace, Pepcid, OxyContin and Flexeril (Tr. 351-52).  Following his discharge from the hospital, the plaintiff was followed by Dr. Khoury (Tr. 415).

On June 9, 2004, the plaintiff presented to the Medical University of South Carolina ("MUSC") emergency room with increased pain (Tr. 358-59).  Review of systems was notable for weight loss and difficulty sleeping.  Exam revealed open wound on the right thigh with localized cellulitis.  Diagnoses included wound infection, intractable back pain, insomnia, and constipation.  Thoracolumbar x-rays dated June 9, 2004, showed a burst

5

fracture of T12 vertebral body, unchanged in appearance compared to June 5, 2004 (Tr. 342).

On June 11, 2004, the plaintiff was seen in follow-up at MUSC. He complained of pain in his back (Tr. 348). He had significant bruising on his back and a deep laceration to his posterior thigh. He reported that he was in too much pain to take a shower. Exam was unremarkable. He was in his brace. He was instructed to follow up with Neurosurgery. He was prescribed oxycodone, OxyContin, Flexeril and Motrin.

The plaintiff visited Dr. Khoury again on June 21, 2004 (Tr. 415). He complained mainly of back pain with some left leg numbness particularly in the L5-S1 distribution. Exam revealed stiffness in his back and bruising in the lumbosacral region and a wound in the right gluteal fold in the thigh and left lower extremity. Dr. Khoury's assessment was possible T12 lumbosacral fractures. He planned to repeat MRI scans and plain x-rays. The plaintiff was prescribed Percocet, told to stop taking Oxycodone, to remain out of work until further notice, and wear his brace.

Thoracic spine x-rays dated June 24, 2004, revealed degenerative changes in the dorsal spine with moderate vertebral wedging of T-12 (Tr. 420). A lumbar spine x-ray revealed a moderate compression fracture of T-12 of unknown age (Tr. 421). Dr. Khoury's notes show that repeat scans on July 29, 2004, did not show any clear impingement (Tr. 415). He indicated that the plaintiff would begin injections and instructed him to continue his medications - Lortab, Bextra and Flexeril.

In August 2004, the plaintiff presented to Todd Joye, M.D., with complaints of upper and lower back pain. Examination revealed normal strength in the arms and legs and decreased sensation in the left arm and leg (Tr. 375-76). Dr. Joye noted that the plaintiff was wearing a full back brace that did help him. He reported his current pain as an eight of 10. He stated that his pain increased with prolonged walking. The plaintiff further reported left lower extremity symptoms with prolonged walking. Dr. Joye's assessment was

back pain with radiculopathy.  The plaintiff received bilateral transforaminal epidural steroid injections at T12-L1.

On September 9, 2004, Dr. Khoury noted that the plaintiff was feeling better (Tr. 415).  He had received several injections and was doing reasonably well with minimal complaints.  His Lortab was refilled.  Also on September 9, 2004, the plaintiff saw Dr. Joye in follow-up and reported that the injections did not help his pain (Tr. 374).  He complained of thoracic pain with radiation around his ribs and coccyx pain due to his fall.  On exam, the plaintiff was in a moderate amount of distress, but sensation and strength were normal.  Assessment was thoracic radiculopathy.  He received a thoracic steroid injection.

Thoracic spine x-rays dated September 12, 2004, showed compression of the T12 vertebra with somewhat accentuated kyphosis at the thoracolumbar junction appearing similar to the configuration on sagittal MRI images of June 24th (Tr. 422-23).  Mild degenerative changes and indicia of previous cervical spine surgery were also observed. A thoracic spine MRI dated November 29, 2004, showed:

 - multilevel degenerative disc disease with osteophytic contact with the ventral margin of the thecal sac at the T7-8 level;

- a shallow left paramedian disc bulge at T5-6;

- focal central disc protrusion at T8-9 contacting the ventral thoracic cord but which did not frankly deform it; and

- moderate compression deformity of T12 with retropulsion of the posterior superior endplate of the vertebral body into the spinal column resulting in frank cord impingement similar to June 24 exam.

(Tr. 424-26).

On January 13, 2005, Dr. Khoury noted that the plaintiff had not seen any improvement.  The plan was for a posterior fusion (Tr. 416).  Thoracic spine x-rays dated January 16, 2005, showed compression of the T12 vertebra, similar to the September 12th exam with somewhat accentuated kyphosis in this area (Tr. 427).  Mild degenerative

changes in the thoracic spine and postsurgical changes in the lower cervical spine were also observed. Lumbar spine x-rays confirmed compressed T12 vertebra (Tr. 428).

On January 31, 2005, the plaintiff reported that epidurals gave him about 50 percent relief from his pain for about two weeks (Tr. 373). He was trying to get approval for a fusion. He had secondary complaints of lower back pain with numbness over his tailbone area and tingling in his left lower extremity. Dr. Joye's assessment was lumbar radiculopathy. He administered a caudal epidural steroid injection.

On February 11, 2005, Dr. Khoury performed a T12 laminectomy (removal of the posterior arch of the T12 vertebra) and fusion at T10-L2 (Tr. 437). At discharge he was given Percocet and Flexeril for pain. He was instructed to wear a brace when up. Thoracic and lumbar spine x-rays dated February 12, 2005, showed postsurgical changes and mild degenerative changes in the thoracic spine (Tr. 429-30). On February 22, 2005, the plaintiff returned for staple removal and complained of significant spasms (Tr. 416). He wanted to change from Percocet to Lortab, which was allowed. His wound looked good.

On March 29, 2005, Dr. Khoury observed that the plaintiff was progressing well and cutting back to one Lortab every six hours (Tr. 416). Thoracic and lumbar spine x-rays on May 15, 2005, revealed stable appearance of the thoracolumbar spine (Tr. 431). On May 16, 2005, Dr. Khoury noted that the plaintiff was six months status post surgery (Tr. 417). He was to receive epidural steroids. On June 30, 2005, the plaintiff was in much less pain and was not given any pain medicine.

On May 25, 2005, the plaintiff presented to Dr. Joye for a follow-up appointment. He stated that the last injection helped his back pain and left leg pain and numbness in his left leg but not the numbness over his tailbone. He reported surgery had nearly resolved his upper back pain (Tr. 372). At follow-up appointments in June and July, the plaintiff reported injections had provided significant relief of his low back and leg pain (Tr. 370-71).

8

In August 2005, Dr. Khoury noted the plaintiff was doing very well. In November, the plaintiff reported his upper back pain had totally resolved. The plaintiff, however, complained of coccygeal pain, cramping in his left calf, and burning in his left foot. Examination revealed negative (normal) straight leg raises, no weakness of the leg muscle groups, and good peripheral pulses in the left leg. He was to undergo EMG and conduction studies to make sure he did not have a peripheral nerve injury. He reported taking four Lortab and three Flexeril per day (Tr. 417-18).

On September 28, 2005, the plaintiff reported to Dr. Joye that he had waited too long for his next injection (Tr. 369). He was in the midst of a medical exercise program. He reported pain in the usual areas and received injections as he had on prior visits. On November 9, 2005, Dr. Joye noted that the plaintiff reported relief, but continued to report weakness in his legs when climbing stairs (Tr. 368). Injections were administered. Dr. Joye started him on Lyrica. Notes from December 21, 2005, were nearly identical (Tr. 367). Dr. Joye noted that Dr. Khoury was also experimenting with adding Valium to the plaintiff's regimen.

At an appointment in February 2006, the plaintiff continued to complain of chronic lower back pain and burning in his left leg and was referred to Kerri Kolehma, M.D. for pain management (Tr. 418). The plaintiff was seen by Dr. Kolehma in March 2006 for evaluation of leg pain (Tr. 477). Examination revealed a normal gait, normal muscle bulk and tone, and negative seated and supine straight leg raises (Tr. 478). The plaintiff reported severe bilateral leg pain, left greater than right, and heavy feeling aggravated with walking. He told Dr. Kolehma that he suffered from a left foot drop and that his ankle did not want to work. He further reported numbness in his last three toes on the left. The plaintiff told Dr. Kolehma that his back surgery decreased his T10 radicular pain but described dull, constant pain in one spot around T12. He was taking Lortab, Darvocet-N 100 and Flexeril.

9

On April 5, 2006, Dr. Joye again administered injections and opined that the plaintiff had a great chance of reducing his overall disability from his accident so long as he continued treatment with Dr. Kohlema (Tr. 365). The plaintiff returned to Dr. Kolehma twice monthly from April to September 2006 (Tr. 487-93). He was on and off various doses of several medications including Lortab, Flexeril, Kadian, and Skelaxin.

In April 2006, the plaintiff was seen by Kevin Beach, M.D., for complaints of leg pain (Tr. 383). Testing revealed peripheral vascular disease of the legs, and the plaintiff underwent surgery on May 30, 2006 (Tr. 389). At follow-up appointments in June and July, Dr. Beach noted the plaintiff was doing amazingly well and encouraged a walking program and smoking cessation (Tr. 380-81).

On August 9, 2006, Dr. Kolehma suggested that the plaintiff try swimming or biking to see if this would allow a better quality of life (Tr. 487). On August 21, 2006, Dr. Beach noted that the plaintiff could not tolerate Pletal due to headache (Tr. 380). He wanted to quit taking Plavix due to cost issues. Dr. Beach encouraged the plaintiff to stop smoking, take aspirin, and to try taking a half dose of Pletal.

On September 6, 2006, Dr. Kolehma opined that the plaintiff had reached maximum medical improvement and directed him to return to Dr. Khoury for an impairment rating and permanent restrictions related to his back surgery (Tr. 486). He was to continue medications. Dr. Kolehma noted that consideration of return to work would need to be determined based on the proposed job description and suggested vocational counseling as the plaintiff was "very motivated to work"

The plaintiff returned to Dr. Khoury in October 2006 for a follow-up appointment. He noted the plaintiff was doing reasonably well and had reached maximum medical improvement, but opined the plaintiff was not able to return to any kind of work activity at that point. He further opined the plaintiff might need a vocational rehabilitation evaluation (Tr. 418).

10

At a follow-up visit with Dr. Kolehma in January 2007, she noted the plaintiff's pain was controlled with medication and that the plaintiff reported he "feels like a million bucks." Examination revealed a normal gait and normal motor strength. He was able to clean his home and reported working out (Tr. 479).

On February 14, 2007, the plaintiff reported that Tylox was not working anymore and that it made him mean (Tr. 537). He admitted smoking marijuana to help relieve his pain and was advised that if he tested positive for such in the future, he would be dismissed from the practice. He was referred to Dr. Kee, continued on his medications and recommended a trial of a TENS unit. On February 28, 2007, Dr. Kolehma noted that the plaintiff's drug screen was inconsistent with his self-reported Tylox use and required that he return on a weekly basis for his prescriptions (Tr. 536).

In March 2007, Charles Fitts, M.D., a state agency physician, reviewed the plaintiff's records and completed a Physical Residual Functional Capacity Assessment form (Tr. 494-501). Dr. Fitts determined the plaintiff was capable of performing the exertional requirements of light work (Tr. 495).

The plaintiff was seen by William Kee, Ph.D., a licensed clinical psychologist, on April 11, 2007, upon referral from Dr. Kolehma (Tr. 519-22). The plaintiff was noted to use denial during the interview portion of the exam. He denied problems with depression, but reported social withdrawal and lack of interest in daily activities. He reported anxiety on a daily basis and was noted to jiggle his legs and move frequently around the room secondary to pain and tension. He denied crying spells, suicidal ideation, phobia, mania and PTSD. Results from a Beck Depression Inventory indicated a self-report depression score in the minimal range. The Beck Anxiety Inventory indicated a self-report anxiety score in the mild range. A Brief Pain Inventory indicated a pain severity score in the moderate range. He reported receiving 30% relief from the current pain regimen. The plaintiff's Pain Interference Score was in the moderate range. Scores were lower than other

11

patients with persistent back pain.  Dr. Kee concluded that the plaintiff might benefit from individual psychotherapy to work on cognitive and behavioral techniques for management of pain, anxiety, and stress.  Dr. Kee also thought that the plaintiff might benefit from physical therapy.  His diagnoses included adjustment disorder with anxiety and pain disorder associated with medical and psychological factors.  The plaintiff's GAF was 65 on that date, indicating some mild symptoms or some difficulty in social, occupational, or school functioning.  At subsequent visits, Dr. Kee discussed relaxation techniques for the plaintiff to help manage his pain, noted complaints of nightmares and suggested aquatherapy (Tr. 523-25).

On May 19, 2007, the plaintiff saw Dr. Dehaven in follow-up for hypothyroidism and chronic pain (Tr. 544).  He reported that he tired easily and had little exercise tolerance.  He told Dr. Dehaven that Tylox caused nausea and vomiting.  He testified that he was unable to sit for more than 15 minutes or stand and walk for 10 and had constant backache and pain.  The plaintiff told Dr. Dehaven that he wanted to start a new career in gardening or design but was unable to stoop without assistance standing back up again.  While his mood was improved with Cymbalta, he told Dr. Dehaven that it was a "constant fight" to keep his spirits up and manage his pain.  On exam, Dr. Dehaven observed that the plaintiff smelled of alcohol and noted tenderness in the mid to lower lumbar spine and spasm.

On May 21, 2007, Dr. Kolehma's notes indicate that the plaintiff had called several times during the prior week reporting that Tylox was causing vomiting.  Dr. Kolehma advised Dr. Kee that she would no longer be prescribing him any opioid medications (Tr. 528).

The plaintiff returned to Dr. Dehaven on May 31, 2007 (Tr. 542-43).  He was taking 40 mg of methadone for leg pain.  Dr. Dehaven's assessment included hyperlipidemia, hypothyroidism, right otitis media, pharyngitis, vascular disease with

claudication, and opiate habituation.  He was referred to Dr. Beach.  Medications as of that date included Ceftin, Tussibid, and methadone.

The plaintiff returned to Dr. Beach in July 2007 for a follow-up appointment (Tr. 604).  He noted that the plaintiff had done fairly well, but continued to smoke and had some left-sided claudication (Tr. 604).  An angiogram revealed blockage in the left popliteal vein (Tr. 589), and on September 9, 2007, the plaintiff underwent popliteal bypass surgery (Tr. 602).

Dr. Khoury's notes from August 15, 2007, reflect that the plaintiff had "lost" Drs. Kolehma and Dehaven due to overdosing his medicine (Tr. 566).  He reported some posterior back pain without radiation.  Tenderness was noted on the right at the thoracic lumbar junction. X-rays were planned to determine whether the plaintiff was experiencing instrument-related pain.  He was prescribed Ultram and Zanaflex but no narcotics. X-rays dated August 16, 2007, showed postsurgical changes and a healed fracture of T12, but were otherwise unremarkable.  Likewise, x-rays dated August 20, 2007, showed no change (Tr. 568).  The plaintiff was to be administered injections to alleviate his pain.

On September 19, 2007, the plaintiff began seeing Marc Dubick, M.D., for a series of injections (Tr. 621-23).  Upon exam, Dr. Dubick noted good cervical range of motion with some mild decrease in flexion.  Some mild discomfort on palpation at the base of the occiput on the left side was also observed.  Testing revealed weakness bilaterally with pain in the thoracolumbar region. Significant leg length discrepancy was noted, as was decreased sensation in the low back and buttock area from approximately L5 down to the mid buttock region.  Dr. Dubick recorded exquisite pain to palpation at T12, the site of his compression and just to the right of midline where most of the plaintiff's pain was generated.  From a standing position, forward flexion was only mildly limited.  Dr. Dubick recommended structural evaluation by Dr. Azzolino and injection under fluoroscopic guidance.

On September 24, 2007, the plaintiff was seen by Dr. Tony Azzolino at Charleston Non-Surgical Center (Tr. 631-33). On exam, Dr. Azzolino noted cervical range of motion was reduced in all directions and reduced cervical strength in extension. The plaintiff was tender to palpation of the mid thoracic facet joints with muscle spasms and markedly tender to palpation of the T11-L1 on the right side. Tenderness to palpation was observed on the left side greater than right lower lumbar facet joints and left sacroiliac joint. Lumbar range of motion was reduced in extension and right lateral bending. Dr. Azzolino prescribed chiropractic manipulation to restore proper joint motion and promote healing. He planned to provide therapeutic exercise and neuromuscular reeducation to help restore joint integrity and movement patterns.

At a follow-up appointment on October 31, 2007, Dr. Dubick noted the plaintiff was experiencing a marked reduction in pain (Tr. 686). Dr. Dubick's notes from November 28, 2007, reflect that the plaintiff's pain medication was to be increased (Tr. 685). He was prescribed Kadian, and Roxicodone was added for pain to increase his functional activities. Diazepam was prescribed for muscle spasms. On December 17, 2007, Dr. Dubick noted that the plaintiff was "doing very well with the addition of the Kadian" and that his "functional level ha[d] increased dramatically" (Tr. 748).

In January 2008, Mary Lang, M.D., a state agency physician, reviewed the plaintiff's records and completed a Physical Residual Functional Capacity Assessment form (Tr. 689-96). Dr. Lang determined the plaintiff was capable of performing the exertional requirements of sedentary work (Tr. 690).

On February 27, 2008, the plaintiff told Dr. Dubick that he had decided not to have a third proliferant injection, but wished instead to have injection of anti-inflammatory in the sacrococcygeal area to decrease his pain and allow him to ambulate and exercise more (Tr. 745). Dr. Dubick's notes from March 19, 2008, reflect that the plaintiff was experiencing significant pain in the coccygeal region that lasted for several weeks,

14

described as sciatica that radiated down to his right heel (Tr. 744). He observed significant weakness above the fusion site from T3 to T8. Medication was changed to Duragesic patch. Dr. Dubick recommended alternative proliferant with human growth hormone ("HGH") and testosterone to treat his sacrum and lumbar facet region pain.

On April 1, 2008, the plaintiff presented to Summerville Behavioral Health with symptoms of obsessive/compulsive disorder ("OCD") (Tr. 722). He was continued on Cymbalta and prescribed Zoloft. On July 14, 2008, the plaintiff returned reporting a series of panic attacks (Tr. 721). At a follow-up visit on September 15, 2008, he reported that he was ambulating better, working in his yard, and getting out of his house.

The plaintiff continued to visit Dr. Dubick for injection therapy and pain medication refills from April 2008 to July 2009 (Tr. 725-743). On June 10, 2008, Dr. Dubick noted the plaintiff's acute pain had been resolved (Tr. 741). On May 6, 2009, Dr. Dubick observed that the plaintiff was "gardening and doing normal activities" (Tr. 727). On July 20, 2009, the plaintiff presented to Dr. Dubick following a fall, which had exacerbated his back pain (Tr. 309). He was noted to be wearing a brace and using his cane. His narcotic pain medication prescriptions were rewritten. The plaintiff continued to visit Dr. Dubick in 2009, who noted that he continued to improve, but still experienced thoracolumbar pain and had to rely on a cane to walk (Tr. 310-11). On November 11, 2009, Dr. Dubick noted that the plaintiff had tapered off Roxicodone and was just using methadone and ibuprofen for pain (Tr. 313). He had some increase in muscle spasms that was helped with Valium. The plaintiff was followed on a monthly basis by Dr. Dubick, who administered injections and pain medication (Tr. 314-26). Starting in January 2010, the plaintiff reported an increase in muscle spasms in his neck and back (Tr. 316, 326).

The plaintiff testified at the September 11, 2009, hearing that he had been unable to work since his June 2004 accident because of pain (Tr. 38). He also testified that for the first two years following his accident (June 2004 through June 2006) he was

15

bedridden and then he was in a wheelchair for two years (Tr. 39). He stated he felt comfortable lifting 10 pounds correctly and spent a third of each day lying down (Tr. 39-40). He further stated that since his accident, he has had a heart attack (Tr. 40).

At the January 18, 2011, hearing, the plaintiff testified that he had lost 20 pounds. He further testified that he had been depressed and had "been suicidal feeling" (Tr. 51). He stated that muscle spasms had gotten worse and he could not walk or sit very long (Tr. 53-54). The plaintiff testified that pain medication made him feel sleepy and confused (Tr. 54-55). He testified that he spent his day watching television and doing what little housework he could manage (Tr. 59).

## ANALYSIS

The plaintiff alleges disability commencing June 4, 2004, at which time he was 43 years old. He was 49 years old on December 31, 2009, the date he was last insured. The plaintiff has at least a high school education and past relevant work as a house painter and cosmetologist. The Appeals Council found that the plaintiff's degenerative disc disease status post fusion and history of obesity were severe impairments. The Appeals Council further determined that the plaintiff could perform a full range of sedentary work as defined in 20 C.F.R. § 404.1567(a). The plaintiff argues (1) the Commissioner's decision is not based on substantial evidence; (2) the ALJ failed to evaluate the combined effect of his multiple impairments; (3) the ALJ performed a flawed credibility analysis; and (4) the ALJ's RFC analysis is not based on substantial evidence.

### *Substantial Evidence*

The plaintiff first argues that the Commissioner's decision is not based on substantial evidence because certain evidence was not considered. As discussed above, the ALJ issued a decision on October 5, 2009, finding the plaintiff was not disabled under the Social Security Act. In its remand order dated July 16, 2010 (Tr. 82-84), the Appeals Council directed, among other things, that the ALJ consider the medical evidence for the

16

period from the plaintiff's alleged onset date (June 4, 2004) to the date of his first administrative denial (May 2006). Another hearing was held, and the ALJ issued his decision (the "second ALJ decision") on January 27, 2011, again finding the plaintiff was not disabled (Tr. 17-27). The Appeals Council granted review, and on August 12, 2011, the Appeals Council issued a decision finding the plaintiff was not disabled (Tr. 3-6), thereby making the Appeals Council's decision the final decision of the Commissioner of Social Security. In that decision, the Appeals Council adopted the ALJ's findings in the second ALJ decision at all steps of the sequential evaluation process (Tr. 3-6).

The plaintiff argues that the ALJ[2] failed to consider any evidence from the period between June 4, 2004, and May 2006, in the second ALJ decision as the Appeals Council ordered him to do, and, therefore, the decision is not based on substantial evidence. The ALJ specifically discussed evidence related to the period between March 24, 2006, and January 12, 2007 (*see* Tr. 22-24 (citing ex. 7F)). The ALJ also cited evidence from the time period between April 24, 2006, and August 21, 2006, in noting that the plaintiff continued to smoke despite his doctors' recommendations that he stop (*see* Tr. 23 (citing ex. 3F). In making his RFC finding, the ALJ specifically stated that he had considered "the entire record (Tr. 21). Similarly, the Appeals Council stated in its decision that "the entire record" was considered in making its findings (Tr. 5).

As argued by the Commissioner, a decision maker "is not required to provide a written evaluation of every piece of evidence, but need only 'minimally articulate' his reasoning so as to 'make a bridge' between the evidence and his conclusions." *Jackson v. Astrue*, C.A. No. 8:08-2855-JFA-BHH, 2010 WL 500449, at *10 (D.S.C. Feb. 5, 2010) (quoting *Fischer v. Barnhart*, 129 Fed. Appx. 297, 303 (7th Cir. 2005)); *see also Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) ("ALJ is not required to discuss all the evidence

_____

[2]While the Appeals Council's decision is the final administrative decision in this case, the plaintiff focuses on the second ALJ decision because "its subsequent adoption by the Appeals Counsel was largely made without significant elaboration" (pl. brief 16-17).

submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.") (citations omitted).  Here, the Appeals Council, as well as the ALJ, found that the medical evidence as a whole indicated the plaintiff's condition improved with treatment (*see* Tr. 5, 22).  The evidence in question that the plaintiff argues was not considered also shows that he obtained significant relief from his lower back and leg pain with injections (Tr. 370-71), and subsequent to his back surgery, his thoracic pain totally resolved (Tr. 372, 418).  The plaintiff has failed to show that he was harmed by any error by the ALJ and Appeals Council in not further discussing the evidence. *See Garner v. Astrue*, 436 Fed. Appx. 224, 226 n.* (4th Cir. 2011) (citing  *Shinseki v. Sanders*, 556 U.S. 396 (2009) (stating party attacking agency determination bears the burden of showing that an error was harmful)).  Accordingly, this allegation of error is without merit.

### *Combination of Impairments*

The plaintiff next argues that ALJ failed to properly evaluate the combined effects of his multiple impairments.  When, as here, a claimant has more than one impairment, the ALJ must consider the severe and nonsevere impairments in combination in determining the plaintiff's disability.  Furthermore, "[a]s a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989).  It "is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity.... [T]he [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them." *Id.* (citing *Reichenbach v. Heckler*, 808 F.2d 309 (4th Cir.1985)).

Notably, the ALJ compared the "combined effects of the claimant's impairments, both severe and non-severe" with the closely analogous listings and determined that they were not at least equal in severity to those listings (Tr. 20-21).

18

Moreover, the ALJ stated that he had "specifically considered the cumulative effects of the impairments on the claimant's ability to work" (Tr. 21). The ALJ noted that the plaintiff's heart condition was asymptomatic despite his history of obesity and that, even considering the combined effects of the plaintiff's obesity, the treatment records did not indicate that the plaintiff's degenerative disc disease status post fusion resulted in an inability to ambulate or perform fine or gross motor movements effectively. The ALJ further stated that the plaintiff's physical impairments affected his mental health condition, but considering them in combination, they resulted in no more than mild limitations in his activities of daily living, social functioning, concentration, persistence or pace, and no episodes of decompensation (Tr. 20-21).

In making his RFC finding, the ALJ discussed the effects of the plaintiff's obesity and adjustment disorder on his ability to perform work activity (Tr. 24-25). Because of the plaintiff's adjustment disorder, which he found to be a severe impairment, the ALJ limited the plaintiff to unskilled work activity (Tr. 25). The Appeals Council, however, found that the plaintiff's adjustment disorder was not a severe impairment as it only caused mild restriction in activities of daily living, mild difficulties in social functioning and maintaining concentration, persistence, and pace, and no episodes of decompensation (Tr. 3-4). The Appeals Council did not limit the plaintiff to unskilled sedentary work but found the plaintiff had the RFC to perform a full range of sedentary work (Tr. 4). Based upon the foregoing, this court finds that the ALJ, and the Appeals Council in adopting his findings, adequately evaluated the combined effects of the plaintiff's impairments. *See Thornesberry v. Astrue*, C.A. No. 4:08-4075-HMH, 2010 WL 146483, at *5 (D.S.C. Jan. 12, 2010) (ALJ's findings indicate he adequately evaluated combined effects). Accordingly, this allegation of error is without merit.

19

*Credibility*

The plaintiff also argues that the ALJ failed to properly assess his credibility. The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)     the individual's daily activities;

(2)     the location, duration, frequency, and intensity of the individual's pain or other symptoms;

20

(3)     factors that precipitate and aggravate the symptoms;

(4)     the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)     treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)     any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)     any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.

In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565. However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p).

The court further acknowledged:

While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its

21

> severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig v. Chater*, 76 F.3d 585, 595 (4th Cir. 1996)). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. § 404.1529(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled.  However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

In making its decision that the plaintiff was not disabled, the Appeals Council explicitly stated that it adopted the ALJ's credibility finding (Tr. 4).  The ALJ found that while the plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, the plaintiff's statements regarding the intensity, persistence, and limiting effects of those symptoms were not fully credible (Tr. 22). Specifically, the ALJ stated that the record showed that with treatment the plaintiff had experienced improvement in his condition (Tr. 22).   The ALJ cited multiple office notes showing that surgery, medication, and injections had significantly improved the plaintiff's pain and had increased his level of functioning (Tr. 22; *see* Tr. 370-72, 380-81,  417-18, 479, 686, 727, 741, 748). The ALJ also noted that nothing in the record supported the plaintiff's testimony that he had been in a wheelchair for two years following his accident (Tr. 24).

22

The ALJ also noted that the plaintiff's daily activities were inconsistent with his allegations of disability (Tr. 23). Specifically, the ALJ noted that the plaintiff's activities included walking his dogs, cleaning house, fishing, working in the yard, and exercising. While evidence of a claimant's daily activities may not be determinative on the issue of disability, they certainly provide significant support for the conclusion that a claimant's complaints are not fully credible. *See* SSR 96-7p, 1996 WL 374186, at *3 (stating that a claimant's daily activities and other factors should be considered when assessing credibility); 20 C.F.R. §§ 404.1529(c), 416.929(c).

The ALJ also stated in his credibility finding that the plaintiff had not been entirely compliant in taking prescribed medications and following prescribed treatment (Tr. 23). Specifically, on February 28, 2007, Dr. Kolehma noted that the plaintiff's drug screen was inconsistent with his self-reported Tylox use of four pills per day, but instead was consistent with taking 12 pills per day (Tr. 536). On May 21, 2007, Dr. Kolehma's notes indicated that the plaintiff had called several times during the prior week reporting that Tylox was causing vomiting. Dr. Kolehma advised Dr. Kee that she would no longer be prescribing him any opioid medications for the plaintiff (Tr. 528). Dr. Khoury's notes from August 15, 2007, reflect that the plaintiff had "lost" Drs. Kolehma and Dehaven due to overdosing his medicine (Tr. 566). The ALJ also noted that the plaintiff had been advised repeatedly to stop smoking, and yet he continued to smoke. The failure to follow treatment advice undermined the plaintiff's complaints. *See Gregory v. Commissioner*, C.A. No. 1:09-413-HMH-SVH, 2010 WL 3046991, at *11 (D.S.C. July 12, 2010) (finding that ALJ did not err in considering the claimant's failure to stop smoking when instructed to do so by her doctors in assessing the claimant's credibility), *Report and Recommendation adopted by* 2010 WL 3046989 (D.S.C. Aug. 2, 2010).

Based upon the foregoing, this court finds that substantial evidence supports the credibility determination of the ALJ and the Appeals Council in adopting his findings.

23

### *Residual Functional Capacity*

Lastly, the plaintiff argues that the ALJ erred in the RFC determination. Social Security Ruling 96-8p, 1996 WL 374184, provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.* at *7 (footnote omitted). Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*

The Appeals Council accepted the ALJ's determination that the plaintiff could perform sedentary work, but rejected his determination that the plaintiff was restricted to unskilled work (Tr. 4). The Appeals Council specifically gave little weight to the opinion of Dr. Khoury (Tr. 4-5), who opined in October 2006 that the plaintiff was not able to return to any kind of work activity at that point (Tr. 418). The Appeals Council cited treatment records showing that the plaintiff's condition had improved (Tr. 5). Substantial evidence supports the RFC assessment: examinations consistently found that the plaintiff had normal muscle bulk, tone, and strength, and negative straight leg raises (Tr. 376, 417, 478); the plaintiff testified that he could lift 10 pounds (Tr. 39); the plaintiff reported that following surgery his upper back pain had totally resolved (Tr. 418); Dr. Dubick noted the plaintiff's acute pain had resolved (Tr. 741); and Dr. Lang, a state agency physician, determined the plaintiff was capable of performing the exertional requirements of sedentary work (Tr. 690).

The plaintiff further argues that, because he has a nonexertional impairment, pain, the use of a vocational expert was necessary to show that jobs exist in the national economy that he can perform (pl. brief 22-23). When a claimant suffers from nonexertional impairments, or a combination of exertional and nonexertional impairments, that prevent him from performing a full range of work at a given exertional level, the Medical-Vocational Guidelines ("the Grids") may be used only as a guide, and the Commissioner must prove through expert vocational testimony that jobs exist in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 49-50 (4th Cir. 1989). As argued by the Commissioner, not every nonexertional limitation rises to the level of a nonexertional impairment so as to preclude reliance on the Grids. Rather, the proper inquiry is whether the nonexertional condition affects an individual's residual functional capacity to perform work of which he is exertionally capable. *Id.* at 49; *Smith v. Schweiker*, 719 F.2d 723, 725 (4th Cir. 1984). Whether a given nonexertional condition affects a particular claimant's residual functional capacity to engage in certain job activities is a question of fact. *Smith*, 719 F.2d at 725 (citation omitted). Here, the Appeals Council reasonably determined that the plaintiff's pain would not prevent him from performing a full range of sedentary work. *See* 20 C.F.R. § 404.1546(c) (at the Appeals Council review level, the responsibility for assessing an individual's residual functional capacity lies with the Appeals Council).

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

January 16, 2013
Greenville, South Carolina